UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 1:21-cr-41-CEA-CHS |
| | ) | |
| JATONI CRAYTON | ) | |

## REPORT AND RECOMMENDATION

**I.     Introduction**

This matter is before the Court on Defendant's Motion to Suppress Statements [Doc. 45]. Defendant Jatoni Crayton contends that all statements made by him to any law enforcement officers were obtained in violation of his constitutional rights. Defendant further asks the Court to suppress any fruits of the unlawfully obtained statements. The Government responds that law enforcement officers advised Defendant of his *Miranda* rights; Defendant knowingly and voluntarily waived those rights; and law enforcement officers had no reason to doubt that Defendant understood his rights.

For the reasons set forth below, the Court recommends that Defendant's Motion to Suppress [Doc. 45] be **DENIED**.

**II.    Facts**

On September 24, 2020, Chattanooga Police Department Narcotics Detective Lee Wolff obtained and executed a narcotics search warrant at 1539 Bradt Street, Chattanooga, Tennessee. This residence is a duplex, and 1539 Bradt Street represents the right half of the duplex ("the 1539 Unit"). The target of the investigation—as well as the resident of the 1539 Unit—was Joe Humphrey. Officer Wolff learned that Defendant Jatoni Crayton ("Defendant Crayton") resided at 1537 Bradt Street, which was the address of the left side of the duplex ("the 1537 Unit").

Following the successful and safe entry into the 1539 Unit, Officer Wolff was standing outside the duplex (while other detectives were searching inside) when Defendant Crayton arrived home. Officer Wolff attempted to speak with Defendant Crayton, but he ignored Officer Wolff and entered the 1537 Unit, which was his residence. A few moments later, Officer Wolff heard Detective Rodney Proffitt shouting from inside the 1539 Unit. Proffitt yelled, "Gun, gun, he's running."

Officer Wolff moved toward the left side of the duplex, where he saw Defendant Crayton trying to lock a side door of the 1537 Unit. Defendant Crayton was attempting to lock the side door with keys he held in his right hand while holding a two-tone pistol in his left hand. Officer Wolff identified himself as a police officer and issued multiple verbal commands to Defendant Crayton to drop his weapon. Defendant Crayton yelled that he had no gun (despite the gun in his left hand). Eventually, Defendant Crayton took off running. Multiple officers gave chase, and eventually caught and detained Defendant Crayton approximately 50 yards from the duplex. Detectives searched the area and recovered a brown and black Taurus, Model PT140 G2, .40 caliber pistol (the "Taurus pistol") along the path Defendant Crayton had taken. Officer Wolff identified the Taurus pistol as the firearm he had seen in Defendant Crayton's hand.

Officer Wolff spoke with Detective Proffitt, who explained that he had been searching the attic area above the 1539 Unit, when he observed the attic door from the 1537 Unit open. Detective Proffitt then observed an arm reach into the attic and grab a brown and black pistol and a large bag of white powder. Detective Proffitt yelled out, startling the person grabbing the items, who then raised the weapon at Detective Proffitt. Detective Proffitt understandably exited the attic hastily—practically falling out of it to get away from the gun. Detective Proffitt identified the recovered Taurus pistol as the pistol he had seen in the attic.

After detaining Defendant Crayton, law enforcement officers walked Defendant Crayton back to the duplex. While walking back, Agent Wolff read Defendant Crayton his *Miranda* rights from a card in his billfold. Law enforcement officers then obtained Defendant Crayton's consent to search the 1537 Unit and performed a protective sweep. Consent notwithstanding, officers chose to wait and obtain a search warrant for the 1537 Unit before performing anything more than the protective sweep. Once the warrant was obtained, law enforcement officers searched the 1537 Unit. In the attic—in the area where Detective Proffitt observed Defendant Crayton grab the firearm—law enforcement officers recovered a pistol holster, two pistol magazines, 122 grams of cocaine contained in three separate bags, and a set of digital scales. Officers also recovered digital scales, pipes, and baggies from the kitchen counter, and a bottle of Mannitol in a kitchen cabinet.

Law enforcement officers transported Defendant Crayton and Mr. Humphrey to the Chattanooga Police Department. Special Agent Thomas Bagwell, with the Bureau of Alcohol, Tobacco, Firearm, and Explosives ("ATF"), met with Defendant Crayton and advised him of his *Miranda* rights. Defendant Crayton agreed to speak with Agent Bagwell. Agent Bagwell interrogated Defendant Crayton for about twenty minutes. Among the questions that Defendant Crayton answered, he admitted to reaching into the attic and retrieving the pistol. He stated the pistol was not his, but he knew it was there, "got spooked," and tried to get rid of it. Defendant Crayton declined to state the identity of the person to whom the pistol belonged. Agent Bagwell asked Defendant Crayton if it was Mr. Humphrey's gun. Defendant Crayton replied, "I don't know" and "I won't say that." Agent Bagwell asked if the "dope" in the attic belonged to Defendant Crayton. Defendant Crayton replied that he did not know who it belonged to. Defendant Crayton stated he had seen the pistol previously on "New Year's" when someone else was shooting it. Agent Bagwell asked Defendant Crayton if he would tell him who shot the gun. Defendant Crayton

replied, "Oh naw . . .that shouldn't even matter though, who was shooting the gun." Agent Bagwell explained that it could if the person was a "felon and stuff like that." In addition to asking his own questions, Agent Bagwell also completed a "CPD Firearms Questionnaire" memorializing Defendant Crayton's responses to various form questions regarding the firearm. Defendant Crayton signed the questionnaire.

Agent Bagwell then told Defendant Crayton that he was next going to question Mr. Humphrey. After about twenty minutes, he returned from questioning Mr. Humphrey to ask Defendant Crayton more questions. Agent Bagwell did not read Defendant Crayton his *Miranda* rights before this second period of questioning. Among other things during the second session, Defendant Crayton said the gun had been up in his attic for about a month, but indicated that he did not buy it and does not own it. He said he did not know who put the gun up there. He said he grabbed it and tried to run with it because he was afraid the police would get it.

## III. Discussion

Defendant Crayton first claims that the Government must prove that there was a knowing and voluntary waiver of his constitutional right against self-incrimination. Defendant Crayton is correct. The Government bears the burden of proof "to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona*, 384 U.S. 436, 475 (1966). A defendant may relinquish his *Miranda* rights: (1) if the waiver is voluntary—i.e., "the product of free and deliberate choice rather than intimidation, coercion, or deception;" and (2) if it was knowing and intelligent—i.e., "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

In assessing whether a confession was made voluntarily, a court must determine, after assessing the totality of the circumstances, whether the confession was the product of the defendant's unconstrained free will. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). The Government bears the burden to prove that the confession was voluntary by a preponderance of the evidence. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999); *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992). While the Government bears the burden of proof to show that a waiver of *Miranda* rights was voluntary, the defendant must first point to some evidence of improper police activity. *See United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000) (admitting confession where defendant "failed to advance any evidence of coercive police activity"). As long as there is no coercive police activity, and the defendant understands the nature of the waiver, the defendant may waive his *Miranda* rights regardless of his I.Q. *United States v. Macklin*, 900 F.2d 948 (6th Cir. 1990) (finding the confession of mentally retarded defendants to be voluntary where there was no evidence of coercive police activity and defendants understood the consequences of their actions), *cert. denied*, 498 U.S. 84 (1990).

Here, Defendant Crayton fails to point to any coercive police activity. Indeed, the evidence does not show any such activity. Therefore, Defendant Crayton's waiver was voluntary.

Defendant Crayton does state that he was "chased on foot and physically seized," and that "he does not recall many of the events prior to his questioning, due to his panicked state." [Doc. 45 at 5]. Specifically, Defendant Crayton "does not recall being properly advised of his right to refrain from being interrogated." *Id.* This argument goes to the question of whether Defendant Crayton's waiver was knowing and intelligent.

To determine whether a defendant understood and waived his *Miranda* rights, courts examine the totality of the circumstances, including the suspect's age, experience, education,

background, and intelligence. *See United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010). Here, the totality of the circumstances points toward a knowing and intelligent waiver of Defendant Crayton's *Miranda* rights. Defendant Crayton is 38 years old, has an 11th grade education, and demonstrates a reasonably strong level of intelligence. Defendant Crayton was strategic and selective in answering questions from Agent Bagwell. He clearly understood specific things he was and was not willing to say in order to avoid specific consequences. Defendant Crayton was very calm in his answers and was able to communicate a rational narrative and logical ideas.

Defendant Crayton tries to draw a line for events "prior to his questioning, due to his panicked state." [Doc. 45 at 5]. However, Agent Bagwell read Defendant Crayton his *Miranda* rights immediately before questioning, several hours after he had been chased and arrested. Even assuming, arguendo, that Defendant Crayton was initially too excited to give a knowing and intelligent waiver—a proposition which seems unsupported by the facts—law enforcement officers did not interrogate Defendant Crayton at all between the first time he was read his *Miranda* rights by Agent Wolff, and the second time by Agent Bagwell hours later.

Finally, Defendant Crayton claims that the twenty minutes between questioning sessions by Agent Bagwell could insulate his responses in the second session because no new *Miranda* warnings were given. In *Wyrick v. Fields*, 459 U.S. 42 (1982), the Supreme Court "concluded that a suspect did not need to be readvised of his *Miranda* rights, which he had waived in writing before the initiation of a polygraph examination, because the circumstances had not changed so seriously that his answers no longer were voluntary and his waiver was still knowing and intelligent." *Treesh v. Bagley*, 612 F.3d 424, 431 (6th Cir. 2010) (cleaned up). Since *Fields*, courts "apply a totality-of-the-circumstances test when considering whether a delay between reading the *Miranda*

warnings and custodial interrogation requires the interrogating officers to readvise the suspect of his *Miranda* rights. *Id.* (citing *United States v. Weekley*, 130 F.3d 747, 751-52 (6th Cir. 1997)).

Here, Defendant Crayton was still at the same location, being questioned by the same agent, after a mere twenty-minute interval, with clear follow-up questions due to what was being represented by his co-defendant. The circumstances had not changed so seriously as to invalidate Defendant Crayton's waiver. Instead, the facts show a supplementation to the original interrogation, with Agent Bagwell giving Defendant Crayton a chance to address some new information. Given the totality of the circumstances, Defendant Crayton did not need to be readvised of his *Miranda* rights.

### IV. Conclusion

For the foregoing reasons, Defendant Crayton's constitutional rights were not violated. Therefore, his statements relevant to this matter and any fruits from those statements should not be suppressed. Consequently, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 45] be **DENIED**.[1]

**ENTER.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 149 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370 (6th Cir. 1987).